## Jackson, et al. v. Claypool.

(Decided March 8, 1918.)

Appeal from Warren Circuit Court.

1. Marriage—How Proved—Cohabitation and Reputation.—The fact of marriage may be proved circumstantially by cohabitation, by

the fact that the persons had children whom they acknowledged and to whom they gave the family name, by the alleged husband's support of the alleged wife and children, or by acts or conduct of the parties probatively relevant.

2. Slaves—Inheritance by or From Slave Marriage.—The children of a customary slave marriage are the legal heirs of their parents.

3. Bastards—Inheritance.—Bastards may inherit from their mother.

4. Taxation—Sale of Land for Taxes—Interest of Purchaser.—Where land was assessed for taxation in the name of a widow who was in possession as dowercss of her deceased husband, the purchaser at a sheriff's sale for taxes took only the interest of the widow.

5. Adverse Possession—Limitation of Actions.—One who purchases the interest of a widow who was holding land as doweress of her deceased husband, and enters upon the land, does not hold adversely to the deceased husband's heirs during the life of the widow, and limitation against the heirs does not begin to run until after the death of the widow.

6. Ejectment—Lien for Improvements.—Where a purchaser buys land in good faith but under a defective title, and improves the land believing himself to be the owner thereof, he will, upon being ejected, be entitled to a lien for his improvements thus placed upon the land to the extent that they have enhanced the salable value of the land.

BRADBURN & BASHAM for appellants.

JOHN B. GRIDER and CHARLES DRAKE for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This is an action in ejectment by the heirs of Wash Kelley to recover twelve acres of land in Warren County. Wash Kelley and Susan, his wife, colored, were born slaves. They were married, while slaves, according to the simple form customary among slaves. Wash belonged to James Starks, of Allen county, while Susan belonged to T. J. Morehead, of the same county. Of this marriage three children were born, Joe, Malindy and Matilda.

While she was a slave Matilda was sold by T. J. Morehead to John Claypool, and when she became free she took the name of her former master, and was thereafter known as Matilda Claypool. Upon the death of James Starks and a division of his estate a few years before the war between the states Wash became the property of Mrs. Miles Kelley, a daughter of James Starks. When he secured his freedom Wash took the name of his former mistress and was ever known thereafter as Wash Kelley.

Susan died in about 1862, and Wash subsequently married Mary, who died leaving no children by this marriage. Wash then married Daphne, his third wife.

Subsequently, the date not being definitely given, but before 1894, Wash bought from F. G. Cox the twelve acres of land in controversy, Cox giving Wash a title-bond obligating Cox to make Wash a deed upon the payment of the purchase money. Wash paid the purchase money, but both Cox and Wash having died before a deed was made, Cox's heirs, by deed dated August 16, 1894, conveyed the twelve acres to "Daphne Kelley, widow of Wash, and the children and heirs of Wash Kelley," reciting in the habendum clause that the land was to be held by "Daphne Kelley, widow of Wash Kelley, his children and heirs with the same rights and interest that they would have under the law taken, if this conveyance had been made to Wash Kelley before his death."

Upon the death of Wash, Daphne, his widow, continued to live upon and occupy the twelve acres, no dower having been assigned her and no one questioning her right to occupy the entire tract.

In 1896, the sheriff sold the twelve acres for the taxes of 1894, Thomas becoming the purchaser. Thomas assigned his bid to Peter Butts and the sheriff made a deed to Butts on Sept. 8, 1905, for the consideration of $2.51, the amount of the tax. By deed dated Feb. 13, 1913, Butts conveyed the land to the defendant, James Claypool, who has occupied it ever since. By a stipulation of record it is shown that Thomas purchased the land at the tax sale in 1896 and took possession of it at that time, and that he and those claiming under him, including the defendant, James Claypool, have since been in possession of the land in question, exclusively and continuously claiming it as their own.

Matilda Claypool, the daughter of Wash and Susan Kelley, died in about 1909, leaving two children, the appellants, Hallie Keel and Lena Jackson.

When Peter Butts took possession of the land in question under his tax deed of Sept. 8, 1905, Daphne, the widow, surrendered possession to Butts and never afterwards lived upon the land. Daphne died in 1905, and on July 31, 1916, Lena Jackson, Hallie Keel, Malinda (now Smith), and Joe Kelley, as the heirs at law of Wash Kelley, brought this action in ejectment against James Claypool to recover the twelve acres of land bought from Cox and claiming rents at the rate of $50.00 per year, and

$20.00 damages to the dwelling, making a total claim, for rent and damages, of $270.00.

Besides containing a traverse, the answer puts in issue the marriage of Wash Kelley to Daphne. The answer further alleges that defendant's grantor took possession of the land in question under the sheriff's deed more than twenty years before the filing of the petition, and relies upon the defendant's adverse possession of the premises for that period in bar of the plaintiff's right of action. The answer further claims a lien upon the land for the value of the improvements put thereon, in case the defendant should be ejected; and, it further puts in issue the claim of the plaintiffs, or at least the claim of some of them, that they are the heirs of Wash Kelley.

The case was transferred to the equity docket; and, upon a trial, the chancellor dismissed the petition. The plaintiffs appeal.

In order to pass upon the legal issues raised by the pleadings, it becomes necessary to first determine whether Wash and Susan were husband and wife; whether Matilda Claypool, Malinda, and Joe were their legal issue; and whether Daphne was the widow of Wash.

The proof shows to a degree of certainty much more satisfactory than is usual in cases of this character that Wash Kelley and Susan were married in the informal manner usual and customary among slaves, and that Joe, Malinda, and Matilda Claypool were the children of that marriage; that Wash subsequently married Mary while they were slaves; and that after Mary's death he married Daphne.

The slave marriage of Wash and Susan having been clearly shown, their children are their legal heirs. Kentucky Statutes, section 1399a; Botts v. Botts, 108 Ky. 414, 419; Lindsey's Dev. v. Smith, 131 Ky. 177; Turner, Jr., v. Terrill, 30 Ky. L. R. 89, 97 S. W. 396.

As to the marriage of Wash with Daphne it is not shown whether it was a slave marriage or a marriage by license. If it was a customary slave marriage before Feb. 14, 1866, it must be held to be valid, and Daphne entitled to the rights of widow. Kentucky Statutes 1399b. If they were married after Feb. 14, 1866, it is the ordinary case of marriage between free persons and may be shown by parol.

It is plainly shown that Wash and Daphne lived together as husband and wife until Wash's death; that they were treated as husband and wife and so considered

by their neighbors and the public generally, and that no one ever disputed that fact. In the absence of other proof upon that subject, this is sufficient proof to raise the presumption that they had been married in the manner required by law. In Chamberlayne's "Modern Law of Evidence," section 2974, it is said:

"The fact of marriage may be proved circumstantially by cohabitation, by the fact that the persons in question had children whom they acknowledged and to whom they gave the family name, by the alleged husband's support of the alleged wife and children, or by any acts or conduct of the parties probatively relevant."

See also Rockcastle M. L. & O. Co. v. Baker, 167 Ky. 66; Chiles v. Drake, 2 Met. 146, 74 Am. Dec. 406; 18 R. C. L. 426; L. R. A. 1915E 34, note, to the same effect.

As proof of the fact that Joe and Malinda were Wash's children, it is further shown by H. L. Morehead, a son of T. J. Morehead, that shortly after the war Wash Kelley, who then lived in the adjoining county of Warren, went to the home of T. J. Morehead, in Allen county, to claim his children, Joe and Malinda; that T. J. Morehead told Wash he was entitled to his children and could take them; that the children objected strenuously, saying they wanted to remain with Mr. Morehead, their former master, and did not want to go with their father; but that Mr. Morehead insisted upon Joe and Malinda going with Wash, whom he recognized as their father, and that Wash finally took Joe and Malinda home with him.

The doubt as to Matilda being the child of Wash and Susan arose from the fact that having been sold to John Claypool she, following the custom among slaves, took her master's name when she became free, and was thereafter known as Matilda Claypool, while her father was known as Wash Kelley. But it is clearly shown that Matilda was the child of Wash and Susan, and that she died leaving two children, the plaintiffs, Lena Jackson and Hallie Keel.

There is, however, some proof tending to show that Matilda Claypool was never married, and that her two children, Lena Jackson and Hallie Keel, were her illegitimate children by Richard Chapman. And, much is made of this fact, the contention being that they did not inherit the land in controversy and cannot sue to recover it. But if their illegitimacy should be treated as established by the proof it would not prevent them from maintaining this action since they inherited through their

mother, Matilda Claypool, who was a daughter of Wash and Susan Kelley, and not through their putative father, Richard Chapman. Kentucky Statutes, section 1397; Cherry v. Mitchell, 108 Ky. 1.

Having determined that the plaintiffs are the heirs at law of Wash Kelley and have the right to maintain this action, and that Daphne was Wash's widow, the decision of the case depends upon the determination of two questions: (1) What estate did Peter Butts take under the sheriff's deed? and, (2) if he took less than a fee when did limitation begin to run?

Upon the death of Wash Kelley the fee in this tract of land vested in his children, Joe Kelley, Malinda Smith and Matilda Claypool, subject to the rights of the widow Daphne Kelley. No dower was ever allotted to her out of the land, and she continued to occupy it, as widow. She had no other interest, and held as widow and not as an heir—her interest being a life estate at most. While she thus occupied the land it was sold as her land, for taxes. But the sheriff did not attempt to sell any more than Daphne's interest in the land, and the title acquired under the sheriff's deed was only such as she had, that is, an estate for her life. East Kenturky Coal Lands Corp. v. Commonwealth, 127 Ky. 720; Rogers v. McAlister, 151 Ky. 488; McDowell v. Hallowell, 173 Ky. 543; Luther v. Hall, 174 Ky. 360; Smith v. Young, 178 Ky. 380.

Consequently, upon the death of the widow Daphne, in 1905, J. W. Claypool's interest in the land ceased, and the plaintiff's right thereto then accrued. Smith v. Young, *supra*.

The right of the plaintiffs could be asserted at any time within fifteen years thereafter; and since this action was instituted on July 31, 1916, within eleven years after the death of the widow, the action was not barred by limitation. Kentucky Statutes 2505; Smith v. Young, *supra.*

But as the defendant acted in good faith, believing he was the owner of the land, he is entitled to a lien upon the land to the extent that he or his grantor has enhanced its salable value by improvements.

The chancellor therefore erred in dismissing the petition. He should have granted the prayer of the petition by giving the plaintiffs the possession of the land sued for, and requiring the defendant to account for rents for the period of his illegal holding, which began with the

death of Daphne in 1905, to be credited, however, by taxes paid by appellee since 1905, with interest, and by the improvements as above indicated.

Judgment reversed for further proceedings consistent with this opinion.