# Ely & Walker Dry Goods Company v. Freedberg et al.

## (Three Other Cases.)

### (Decided December 4, 1928.)

## Appeals from Webster Circuit Court.

1. Fraudulent Conveyances.—Husband's gift to wife of money at time when husband is solvent and is not anticipating any financial reverses cannot be regarded as fraudulent as to creditors under Ky. Stats., secs. 1906, 1907, or as violating section 2128, relating to transactions between husband and wife.

2. Fraudulent Conveyances.—In suit by creditors of husband to have certain property of wife subjected to their debts, finding of court that wife, who carried on business in her name after husband's bankruptcy, was owner of store building, goods, and fixtures and house and lot held proper under evidence indicating that property was purchased by her or that amount was furnished by husband in satisfaction of indebtedness due her, there being no showing of fraud as to creditors under Ky. Stats., secs. 1906, 1907, 2128.

3. Husband and Wife.—Where insolvent husband assumes full or chief control over his wife's estate and conducts it so as to materially enhance its value, his creditors may subject to their claims the amount of such enhancement as was produced by his skill and labor over and above reasonable profit to wife.

4. Fraudulent Conveyances.—Creditors have no power to compel debtor to labor to earn means to pay their demands, but debtor may limit himself to furnishing himself and family with means of subsistence.

5. Husband and Wife.—Where husband, originally running business, became bankrupt and thereafter wife took over business in her own name with assistance of husband, and where prosperity of business was due to joint efforts and management of husband and wife, husband having been paid larger salary than wife by purchaser of bankrupt stock, and where their earnings over and above family expenses went into the business, husband's creditors were entitled to subject one-half of profits of business to pay husband's debts, after crediting wife with family expenses and legal interest on money invested, in view of Ky. Stats., sec. 2128.

6. Fraudulent Conveyances.—In action by creditors of husband to sequester profits of business carried on in name of wife, in which husband had beneficial interest, plaintiffs acquired lien on the property for their own benefit under Ky. Stats., sec. 1907a, and where recovery was insufficient to satisfy their demands, they were entitled to have it prorated among them without any pro rata allowance to other creditors, such as would be given in action for benefit of creditors generally under section 1910.

7. Fraudulent Conveyances.—In action by husband's creditors against husband and wife to sequester property in wife's name in which husband had beneficial interest, under Ky. Stats., sec. 1907a, court erred in refusing to award judgment for costs against wife, where plaintiffs recovered, and in postponing enforcement of judgment until all of creditors had been ascertained and brought before the court.

VERT C. FRASER for appellants.

RAYBURN & WITHERS for appellees.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming in part and reversing in part.

The Ely & Walker Dry Goods Company filed suit in equity against Max Freedberg and Finis Goldstein, as partners, seeking to recover $4,247.90 due on account. It also made Max Freedberg and his wife, Mollie Freedberg, parties defendant, and sought to have certain described property standing in the name of Mollie Freedberg subjected to its debts. This consisted of several pieces of real estate, including a store building, a stock of merchandise, and two automobiles, it being alleged that all of this was the property of Max Freedberg, and that it had been given and conveyed to Mollie Freedberg fraudulently and to the prejudice of his creditors. The firm of Freedberg & Goldstein made no defense to the indebtedness, and default judgment went against Max Freedberg, the only member of the firm before the

court.   Mollie Freedberg and Max Freedberg filed
separate answers denying all allegations of fraud in con-
nection with the transfers of the property, and asserted
that Mollie was the bona fide owner of all of it without
any collusion upon the part of her husband.  Proper
pleadings made up the issues, and a similar record was
made in each of the above-styled causes.   By agreement
these four cases were consolidated and heard on the same
proof, any judgment in plaintiffs' favor to be prorated.

On final hearing the court was of the opinion that no
fraud had been shown in any of the transactions in-
volved, and that Mrs. Freedberg was the bona fide owner
in her own right of all the property mentioned.   He was
further of the opinion that Max Freedberg had assisted
his wife in the management and direction of the mercan-
tile establishment during a period of 20 months, and that
his services in that capacity were of the reasonable value
of $200 per month, but that the sum of $100 per month
was sufficient for his support and maintenance; that he
had in fact received no greater compensation than that
sum; that in this way the mercantile establishment had
been enhanced in value to the extent of $100 per month,
or the total sum of $2,000, by his services, and adjudged
the latter sum against Mollie Freedberg to be prorated
between all creditors and enforced when the latter were
ascertained, no costs being adjudged against Mollie.  The
above-styled creditors appeal from this judgment, and
Mollie Freedberg prays a cross-appeal.

The facts are these:  Max and Mollie Freedberg
married in 1906; he was an immigrant, 28 years of age.
She was nine years his junior, but was born in America
and spoke English fluently; both were members of the
Jewish race; each had an aptitude for the mercantile
business and the faculty of acquiring and holding friend-
ships.   At the time of the marriage Max had but little
means and Mollie had none.   Max opened a small store
at Trenton and moved from there to Nortonville, and, in
the year 1909, came to Clay City and opened a store.   In
the course of years three children were born, but serv-
ants looked after the household affairs, and Mrs. Freed-
berg stayed in the store and assisted in her husband's
business.   This prospered, and by the year 1913 the
stock had grown to an estimated value of $18,000.   A
fire, which originated in a different building, consumed
this stock.   It was insured for $10,000, and he was in-

debted in an equal amount. He turned his policies over to his creditors under an agreement that when collected the proceeds would be accepted in liquidation of his debts. $8,000 was collected and credited on his debts. One policy was written in a company not authorized to do business in the state, and suit was filed against the agents who wrote it. His creditors were unwilling to extend him further credit until his indebtedness was paid. However, they proposed to extend a good line of credit to his wife if she would enter business in her own name. She accepted this proposition, and with Max's assistance and co-operation ran the business for some two or three years in her own name. At the end of that period Max received an acquittance from his creditors and took over the business in his own name, it being claimed that it was agreed he would reimburse his wife therefor. She continued to assist him in the conduct of the store. The business grew by leaps and bounds, and by the year 1921 Max's estate was of the estimated value of $50,000 or more.

On the 4th of March, 1920, W. I. Cook conveyed two lots to Mollie in Clay City for the recited consideration of $1,650, and the same grantor conveyed a third lot to her on the 5th of February, 1921, for the recited consideration of $500. The consideration seems to have been paid from the business, and, as she claims, from what her husband owed her in the transfer of the stock of merchandise to him in 1916. In June, 1921, Mrs. Freedberg acquired title to a house and lot in Nashville at a cost of $13,000 and furnished it. The family moved there to live, but the business in Clay City was continued. Business was prosperous, and Max, in the fall of 1921, established a branch business at Harrisburg, Ill., and took his two brothers-in-law in partnership, under the firm name of Freedberg & Goldstein, placing one of them in charge of each store. These young men purchased heavy stocks during that winter and the next spring.

In the meantime the mining industry slackened and merchandise declined in value resulting in the bankruptcy of the two firms. Mrs. Freedberg had borrowed $3,500 and loaned it to these firms, and filed her claim for this sum in the bankruptcy proceedings. The facts relating to the acquisition of her property were well known, but her claim was allowed and the title to her other property was not disturbed. The creditors realized small

percentages of their claims, and Max did not seek a discharge from his indebtedness. At the bankruptcy sale David Bogatsky and C. L. Simon, of Nashville, Tenn., purchased the stock of goods at Clay City. They placed Max and Mollie in charge, paying Max considerably the larger salary. This continued until March, 1924, when a fire broke out in an adjoining building and spread to the one occupied by Bogatsky. They salvaged most of the goods and fixtures, though some were destroyed. After the fire Bogatsky and Simon collected the insurance and sold the salvaged goods, fixtures, and accounts to Mrs. Freedberg for the sum of $8,500, taking her note therefor secured by a lien on the Nashville property, no part of which has yet been paid. The goods were straightened out, and Mrs. Freedberg took charge of the business, which has since been conducted in her name, though Max has been present continuously and participating with his accustomed zeal and industry. On the 25th of February preceding Mrs. Freedberg had purchased a lot from J. C. Blackburn for $800, and during the summer and fall of that year she erected a brick storehouse thereon at the cost of about $10,000. In the construction of this building she borrowed $5,000 from Bogatsky and $1,000 from the Webster National Bank, the remaining $4,000 having apparently been paid from the mercantile establishment, either in cash or in settlement of accounts which the laborers owed the firm of Bogatsky & Co., and which the latter firm had assigned to Mrs. Freedberg. Max negotiated the purchase of this lot, and also directed and supervised the laborers in the construction of the storehouse. The business prospered and Mrs. Freedberg purchased an automobile costing $1,200, a radio costing $350. She made enthusiastic and exaggerated reports of her resources to the mercantile agencies, and the impression prevailed that she had acquired some wealth.

On this trial several witnesses estimated the present value of the stock of goods and fixtures at from $25,000 to $40,000. But the court required an inventory be taken by a trustworthy man, and it was found to be $22,765, and there are open accounts due the firm of $1,000. Against this there is an indebtedness on open account due wholesale merchants for goods, wares, and merchandise of $11,318. The brick house and lot cost $10,800, and the chancellor concluded that it is now of the value

of $13,500, its enhanced value over cost being in economical construction and not due to a general increase in value. But we think upon the evidence that it should be rated at $12,500. We do not deem it necessary to refer to changes in value of any other property for the reasons that all of it was acquired by Mrs. Freedberg several months prior to the formation of the partnership of Freedberg & Goldstein, who created the debts sued on, and at a time when Max Freedberg was amply solvent and not anticipating any financial reverses. The evidence indicates that Max paid these amounts in satisfaction of the indebtedness due Mollie for the stock of goods she had acquired during the years 1913 to 1916, and which he took over at the latter date. But if it be assumed that he merely gave these sums to her, such transaction could not be regarded as fraudulent under the provisions of sections 1906, 1907, of the Statutes, or in violation of section 2128. Dalton v. Howell, 180 Ky. 479, 203 S. W. 195; Marcum v. Marcum, 177 Ky. 186, 197 S. W. 655; Perry v. Krish & Co., 157 Ky. 109, 162 S. W. 555; Hatfield v. Cline, 143 Ky. 565, 137 S. W. 213; Ratliff v. Williams, 180 Ky. 152, 202 S. W. 55; Big Plum Creek Turnpike Co. v. Walker & Co., 145 Ky. 269, 140 S. W. 305; Owens v. Childress, 189 Ky. 676, 225 S. W. 487; Cogar v. National Bank of Lancaster, 151 Ky. 470, 152 S. W. 278; Stix v. Calender, 155 Ky. 806, 160 S. W. 514. And it is significant that none of these matters was disturbed in the bankruptcy proceedings. Also there is no indication that Mr. Freedberg withheld any of his estate from the bankruptcy court. The Blackburn lot was acquired in 1924 while he and his wife were conducting the Bogatsky business on a salary and she was receiving rents from the Nashville property; hence there is nothing to indicate that he furnished any of the consideration therefor. It is admitted that Mollie paid for the Bogatsky goods and fixtures by note secured by a lien on the Nashville property. It is also clear that the store building was constructed with funds from loans made by Bogatsky and a local bank, and money and accounts from the business, and no fraud appears in any of these transactions; hence the trial court did not err in adjudging Mollie the owner of all this property.

It remains to be determined whether the subsequent relations between Mr. and Mrs. Freedberg were such as

to render any of her property liable for his debts. Generally the rule in cases of this character is that where an insolvent husband assumes full or chief control over his wife's estate and so conducts it as to materially enhance its value, his creditors may subject the amount of such enhancement as was produced by his skill and labor over and above a reasonable profit to the wife. Guthrie v. Hill, 138 Ky. 181, 127 S. W. 767; Patton v. Smith, 130 Ky. 819, 114 S. W. 315, 23 L. R. A. (N. S.) 1124; Blackburn v. Thompson, 66 S. W. 5, 23 Ky. Law Rep. 1723, 56 L. R. A. 938; Brooks-Waterfield Co. v. Frisby, 99 Ky. 131, 35 S. W. 106, 59 Am. St. Rep. 452. But there is a distinction between rights growing out of domestic relations at common law and such rights existing under our statute. Section 2128. In Guthrie v. Hill, supra, the court in laying down this distinction recognized the right of the wife to employ her insolvent husband as agent in the transaction of her business, and treated the transaction substantially as similar transactions are treated between other near relatives having confidential relations. As to the latter class, we have held that the owner of property may employ an insolvent brother as an agent to manage and control his property without becoming liable for his debts. Teeter v. Williams, 3 B. Mon. 562, 39 Am. Dec. 485; First National Bank v. Lancaster, 14 S. W. 536, 12 Ky. Law Rep. 541; Winfrey's Trustee v. Winfrey, 150 Ky. 138, 150 S. W. 42. In the last case the court quoted with approval the following from Bump on Fraudulent Conveyances, p. 269:

"Creditors have no power to compel a debtor to labor and earn the means to pay their demands. He may limit his contract to just such an extent as may be adequate to furnish him the means of a scanty subsistence, and in all this he violates no right of his creditors. He has the right to labor for another in consideration of the support of himself and family."

It is frequently difficult to determine which of these rules should apply, and a conclusion must be reached from the facts and circumstances of each case in the light of both rules. It cannot be said in this case that Mr. Freedberg assumed full control over his wife's property. It is questionable whether he had chief control over it. But the course of dealing through their business life in-

dicates a close community of interest, in which each supplemented the other. When Mrs. Freedberg assumed control in 1913 Mr. Freedberg was present, counseling, aiding, and assisting. Upon the adjustment of his indebtedness in 1916, he again took charge and Mrs. Freedberg remained at his side. When Bogatsky purchased the bankrupt stock he employed them both to run it and gave Mr. Freedberg much the larger salary. Mr. Freedberg negotiated the purchase of the Blackburn lot for Mrs. Freedberg, and after her purchase of the Bogatsky stock he remained in the store as he had always done, assisted in the purchases, and was active in the administration of the business. He directed the construction of the brick building and the work of the laborers engaged therein, after its construction remained with Mollie at the helm, so that in whatever name the business was conducted the two with unswerving loyalty to each other acted as a unit, and it clearly appears that whatever was earned over and above the family expenses went into the business. True, the parties claim that Mrs. Freedberg is now paying Mr. Freedberg a salary of $50 per week, but they are unable to show how or when this was paid, or to what use it was put, and the evidence indicates that very little of it was drawn out of the business. Under such circumstances the husband should not be treated as a mere agent of the wife, or permitted to increase his family fortune at the expense of his creditors. And giving full credit to the ability and industry of each of these parties it would seem that if the business has prospered it is due to the mutual and joint efforts of both, and that after crediting Mrs. Freedberg with the family expenses and legal interest on the money invested in the business, the profits should be divided equally and the part due Max subjected to his debts. Considered in this way Mrs. Freedberg should be credited with the Blackburn lot and building, $10,800; the cost price of her stock of goods, $8,500; 6 per cent. on these investments for 20 months, amounting to $1,930; and her indebtedness to wholesale firms, $11,318.00—or a total of $32,548. She should be charged with the property acquired during the joint control. This would include: (1) The value of the brick house and lot, $12,500. (2) The stock of goods and fixtures invoiced under the court order at $22,635. But it is well known that a stock of merchandise cannot be sold

in bulk at invoice price, and it is thought 75 per cent. would be a reasonable wholesale value to put on this stock, or $17,000. (3) Accounts due by customers, $1,000. (4) During the time the business has been conducted under the present arrangement Mrs. Freedberg has purchased $1,000 stock in Swift & Co., and paid for this out of the business, and, in addition to family necessities, has paid $1,200 on an automobile and $350 for a radio, and these sums should also be charged. (5) The amount paid out of the mercantile establishment in the erection of the store building, $4,000. Making a total of $37,050, from which should be deducted the total charge of $32,548, leaving $4,502.00, of which one-half, or $2,251, should be subjected to plaintiffs' demands. This is but little in excess of the amount allowed by the chancellor, and would not authorize a reversal, except for other errors appearing in the record.

The chancellor erred in directing the recovery to be prorated between all the creditors. This is not an action under section 1910, Ky. Statutes, for the benefit of creditors generally, but a direct action to sequester property in which Max Freedberg has a beneficial interest, and as it is described in conformity with the provisions of section 1907a of the Statutes, the plaintiffs acquired a lien on the property for their own benefit. In such actions, the benefit is to the diligent, and, inasmuch as the recovery was insufficient to satisfy the demands of the plaintiffs in the consolidated actions, the recovery should have been prorated between them as provided in the agreement of consolidation. 27 C. J. 859; Fuqua v. Farmers' & Merchants' National Bank, 35 S. W. 545, 18 Ky. Law Rep. 101; Tabor v. Armstrong, 99 S. W. 957, 30 Ky. Law Rep. 938.

The chancellor also erred in refusing to award judgment for costs against Mrs. Freedberg, and in postponing the enforcement of the judgment until all of the creditors have been ascertained and brought before the court. On a return of the case judgment will be entered in favor of the consolidated plaintiffs for $2,251, to be prorated as above indicated, and against Mr. and Mrs. Freedberg for costs, without postponement of its execution.

Wherefore the judgment is affirmed on the cross-appeal and reversed on the original.