## Pierce v. J. B. Pierce's Trustee in Bankruptcy et al.

(Decided March 17, 1931.)

496

JAMES & JAMES for appellant.

PENDLETON & BUSH and FAUREST & FAUREST for appellees.

OPINION OF THE COURT BY JUDGE WILLIS—Affirming in part and reversing in part.

The circuit court decreed a lien for $15,000 upon the land of Hattie C. Pierce in favor of the People's State Bank & Trust Company and the trustee in bankruptcy of James B. Pierce. The ground for the judgment was that Pierce had erected improvements and expended money upon the land of his wife which enhanced the vendible value thereof to the extent of the amount adjudged,

which constituted a fraud upon the rights of his creditors. Mrs. Pierce has prosecuted an appeal from the decree.

The questions raised require precision in the statement of the facts alleged in the pleadings and adduced in the proof.

The action was instituted on December 31, 1926, by the People's State Bank & Trust Company of Winchester, Ky., against James B. Pierce and Hattie C. Pierce, upon a promissory note for $5,645.65, given to the bank on July 10, 1923, by Mr. Pierce. It was averred that the note was a renewal of several previous notes given on July 20, 1918, on December 24, 1918, and on February 13, 1919, which several notes were consolidated into the instrument upon which the action was based. The accumulation of principal and interest of the numerous notes aggregated the amount constituting the face of the note set forth in the petition. The original note given on July 29, 1918, was for $3,552.50. It was alleged in the petition that on November 5, 1918, Pierce had purchased from C. W. Quiggins a lot in Elizabethtown, and fraudulently caused it to be conveyed to Hattie C. Pierce; that, within five years before the beginning of the action, Pierce paid for improvements placed upon the lot conveyed to his wife, which aggregated more than $10,000 in value; that on January 23, 1923, Pierce and wife executed to Alice R. Yancey a mortgage upon the improved premises to secure the sum of $10,000 borrowed from Mrs. Yancey, which was used to pay for a portion of the improvements; that during the year 1925, Pierce paid off the mortgage to Mrs. Yancey out of his own money and thereby freed the premises from the mortgage lien; that the placing of the improvements upon said lot and the paying of the Yancey mortgage by Pierce were with the fraudulent purpose of cheating, hindering, and delaying his creditors and without any consideration from Hattie C. Pierce. It was further averred that the value of the lot was enhanced by the improvements in excess of the amount of plaintiff's debt, that Pierce was insolvent when he made the improvements and when he paid the mortgage, and that the plaintiff did not know of the fraud and had no reasonable means of learning thereof until within five years next before the commencement of the action. Pierce answered to the effect that he had been adjudicated a bankrupt on March 1, 1927, upon his voluntary petition, and the bank's claim had been listed in his schedule. Mrs. Pierce tra-

versed the allegations of the petition, and in a second paragraph pleaded that Mr. Pierce contracted the plaintiff's debt about the year 1918 or 1919, and had pledged ample securities thereon, but the officials of the bank were interested in certain speculations with Mr. Pierce, and had converted to the use of the bank securities sufficient to extinguish the indebtedness, and that Pierce became indebted to her in 1918 or 1919, and such payments as he had made upon her property were in discharge of his indebtedness to her.

On March 28, 1927, the trustee in bankruptcy of J. B. Pierce tendered a petition to be made a party to the action, and two days later was made a party plaintiff. The intervening petition adopted the allegations of the plaintiff's petition, and asked that the conveyance of the lot to Mrs. Pierce from Quiggins, the erection of the improvements thereon, and the payment therefor by J. B. Pierce, be adjudged fraudulent, and the trustee given a lien on the land to secure the amount of $5,635.65, with interest from July 10, 1923, until paid. It was apparently the purpose of the trustee to preserve for the benefit of the estate any lien secured by the action of the bank. A joint reply was filed by the bank and the trustee in bankruptcy traversing the affirmative allegations of the answer of Mrs. Pierce. On April 11, 1927, the trustee in bankruptcy filed an independent action in equity against Pierce and wife and the People's State Bank & Trust Company, setting up substantially the same allegations that had been made by the bank in its petition and seeking to have the conveyance of the property set aside and a lien adjudged thereon in favor of the trustee for benefit of the creditors of J. B. Pierce for the sum of $15,000. It was alleged that the value of the lot was enhanced to that extent by the improvements made or paid for by Pierce. The bank filed an answer admitting the allegations of the trustee's pleading, and moved for a consolidation of the two actions. The Pierces filed an answer denying the allegations of the petition of the trustee and pleading affirmatively that the payments and improvements made by J. B. Pierce were in discharge of his indebtedness to Hattie C. Pierce. Over the objections of the Pierces, the court consolidated the actions, and the affirmative allegations of the answer of defendants were traversed of record.

Mrs. Pierce filed an amended answer to which a reply was filed. The amended answer set up the statute

of limitations of five years. The reply denied that the cause of action had not accrued within the five years next before the action was instituted, and pleaded affirmatively that the payments made by J. B. Pierce upon the mortgage debt, and certain other payments made by him, were all made within five years next before the commencement of the action. It was further alleged that the People's Bank & Trust Company, and the other creditors of Pierce had no knowledge of the payments made by Pierce upon the land of his wife until within the last five years before the beginning of the suit, and that by reasonable diligence they could not have discovered the payments made by Pierce until within the period stated.

The Quiggins lot was conveyed to Mrs. Pierce on November 5, 1918, and the deed was duly recorded on November 19, 1918. The deed recited a consideration of $1 and other good and valuable considerations, full payment whereof was acknowledged. The proof shows that J. B. Pierce, on November 7, 1918, paid Quiggins $1,800, but the evidence is not clear as to how the additional consideration was paid, although it indicates that the purchase price was $2,400. Mr. and Mrs. Pierce claim, somewhat vaguely, that the latter paid $600 thereof. On the 8th day of October, 1920, Mr. Pierce entered into a written contract with the Jenkins Essex Company to construct a residence on the Quiggins lot. Pierce agreed to pay monthly the cost of all labor and material, plus 10 per cent. thereon. The Jenkins Essex Company filed an itemized account, and the first items charged thereon preceded the date of the contract. The amount charged before October was about $1,000. Beginning with October, 1920, the charges continued from time to time until April 24, 1922, which is the last item charged on the account. The balance due on January 27, 1922, was $7,041.75. The house was practically completed in December, 1921, and the Pierces then moved into it.

Mr. Jenkins testified that the house constructed under the contract was completed in the fall of 1921, and anything done after that was merely finishing up some small items. He said quite a large portion of the work was done by other people as his contract contemplated. Mr. Pierce failed to meet his monthly obligations under the contract, and the construction of the house was thereby delayed. Work stopped about the middle of December, 1920, and was not resumed until June, 1921.

Jenkins estimated the total cost of the work done and materials furnished in the erection of the building to be between $15,000 and $16,000, but he was not positive those figures were correct. The cause of the confusion was that notes given as payments were credited on the account, and, when not paid, as frequently happened, they were charged back to the account, thus duplicating many charges. Mr. Pierce made a payment to Jenkins Essex Company on March 16, 1921, and other payments from time to time until October 31, 1923. Notes were given by J. B. Pierce alone for the payments as they came due, and the final payments were in discharge of the notes. One note for $3,500, paid May 31, 1922, had been signed both by Mr. and Mrs. Pierce, but it was not shown when that note was originally given, or how often it had been renewed. During the construction of the house Mr. Jenkins learned that the lot belonged to Mrs. Pierce, and filed a mechanic's lien thereon. The testimony of the witness was not clear as to the basis of the charges made prior to the written contract, but probably they were for the construction of another house which had been dismantled and removed to another lot belonging to Mrs. Pierce.

C. E. Keith testified that his firm furnished the stone for windowsills and for the trimming in the building. On January 4, 1922, a payment of $250 was made to his firm, and a note of J. B. Pierce was given for $220, closing the account. The contract was with J. B. Pierce, and he made all the payments thereon. Pierce gave his note for the account when it was due, and carried it along until the payments were made.

The bankers testified that both Mr. and Mrs. Pierce had checking accounts. Pierce made payments on February 14, 1923, to the Hegan Magruder Company, which had a contract for installing screens and for some other work on the building. The bankers could not tell whether the payments were made to discharge previous notes given by Pierce. On February 15, 1923, Pierce paid F. S. Schardein & Son the sum of $1,849.50 upon the plumbing contract. On July 3, 1922, Pierce paid J. S. Strassel Company the sum of $500 for interior decorating. The bankers also testified regarding a $3,500 note of J. B. Pierce to the Jenkins Essex Company. One of the local banks had discounted the note, and it was collected on February 20, 1923, from J. B. Pierce. The amount of interest collected would indicate that the particular note

had been running for approximately four months, but, according to the testimony of Jenkins, it must have been given when the work was finished.

D. M. Cooper, an attorney, held for collection the claims of Watson Manufacturing Company and of Hegan Magruder Company against J. B. Pierce. Suits were filed on the two claims against J. B. Pierce alone. The Watson claim was for screens and the Hegan Magruder claim was apparently for the labor of installing the screens in the house. The Watson contract was dated January 12, 1921, and was signed by J. B. Pierce alone. It called for the manufacture of screens for both doors and windows, and provided for installation by the Hegan Magruder Company. A second contract with the Watson Company, dated March 10, 1922, signed by J. B. Pierce alone, called for some additional screens to be installed by the Hegan Magruder Company. Pierce had given a note, and one of the suits was based upon it.

A. C. Brand testified that his firm, Brand & Bohrman, had a contract with Mr. Pierce for the guttering and spouting to be done on the residence. The bill was about $368, and was never paid. The work was done during the year the house was being erected, and was charged to Mrs. Pierce, as Brand understood it was her property and the house was being built for her. He made no charge against Mr. Pierce, but Mr. Pierce made the contract and frequently promised to pay the bill.

R. M. Strassel testified that Mr. Pierce arranged with him to furnish some rugs and furniture and to do some painting. The bill was $2,287.87, part of which was paid, but there was a balance of $1,000 for which his company still held the note of J. B. Pierce. The item, however, was for personal porperty and not for improvements put on the land.

G. W. Schardein testified that his firm, F. S. Schardein & Son, had the contract for the heating and plumbing. The heating contract amounted to $798, and the plumbing contract to $1,498. Pierce made partial payments upon the two contracts, and the account was closed by a note given on May 23, 1922, for $644.45, which remains unpaid.

Mr. Magruder testified that the contract of Hegan Magruder Company was for hardwood flooring, tiling for the bathroom, and installation of the screens purchased from the Watson Manufacturing Company. The

contract was in writing and signed by J. B. Pierce. The contract price was between $1,500 and $2,000, all of which had been paid by Pierce. When the work was completed, Mr. Pierce paid some cash and gave a note for the balance, and it was carried along until suit was filed in February, 1923, as a result of which the balance was collected. Pierce also made some payments to Watson Manufacturing Company, but that concern was not paid in full. The work was all done prior to May, 1922.

Wm. E. Whaley furnished the face brick and hollow tile which went into the house. It was all supplied in 1921. The price was about $900 or $1,000, which Mr. Pierce had paid, except a balance of $100. Mr. Whaley did not know Mrs. Pierce and never saw her. The contract was not in writing, but consisted of an oral agreement under which he was to furnish the brick and tile required. The account was charged to Pierce and paid by him, except the unpaid balance mentioned.

R. B. Greenwell was foreman in charge of the construction of the Pierce house. He had a copy of the plans and specifications which show that they were prepared for the erection of a "residence for Mrs. J. B. Pierce."

Will Gaither testified that about the time the house was finished or shortly thereafter, he was employed and paid by J. B. Pierce to build a tile garage. The amount was not stated. It will be seen that every contract was made and signed by Pierce and all payments were made by him. It is conclusively shown that he caused the house to be built, and it was done almost entirely with his money or upon his credit. Mrs. Pierce, however, did put some money in the lot and considerable in the house, but nothing like as much as did Pierce.

J. B. Pierce testified that he was in the oil business in Winchester, Ky., from about 1916 to 1919, and while he was in business there he negotiated the loans from the Winchester bank. He purchased the Quiggins lot for Mrs. Pierce through Dr. Montgomery. Mr. Pierce paid $1,800 of the purchase price thereof. Mrs. Pierce then owned a lot known as the Vertress or Daugherty lot which she had previously acquired. Mrs. Pierce was economical, and had been saving to build her a home. He said he had some creditors at the time Mrs. Pierce acquired the lot, but they were not then pressing him. He was speculating in oil and gas leases, and his holdings covered a very large acreage. Both Mr. and Mrs. Pierce

testified that he owed her $12,000 for 3,000 shares of stock in the Peerless Oil Company which he had purchased from her in 1919. The market price of that stock reached $4 per share, but he thought the stock would go much higher. Mrs. Pierce wanted to sell, and insisted upon selling then at $4 per share. Pierce agreed to take her stock at $4 per share and the certificate was transferred to him. Later it became practically worthless. Mr. and Mrs. Pierce seek to justify the payments made by Pierce on the cost of the house as a payment of the debt due her. Pierce said the architect estimated the house should cost about $12,600.

Mr. French, who was in charge of the oil exchange in Winchester, stated there were a few sales of Peerless Oil stock in 1918. Some was sold as high as $6 per share, some at $5 per share, but $4 was then considered about the market value. J. S. Hutsell testified that he bought some Peerless Oil stock in 1918 or 1919 for which he paid $4 per share, and was offered $6 per share for it. There was some additional evidence tending to show that the Peerless Oil stock at one time had a substantial value; but other evidence showed that it was highly speculative and soon became worthless.

The bankruptcy schedule of Pierce showed a large number of debts, some of which were contracted as far back as 1921. It listed a number of notes, dated in 1924, and the total liabilities amounted to $39,134.

The circuit court was of the opinion that the payments for the improvements on the Quiggins lot were constructively fraudulent, as to the People's Bank & Trust Company, respecting its note for $3,552.50, dated July 20, 1918, and that the payment of the mortgage of $10,000 to Mrs. Yancey was constructively fraudulent as to the creditors in general. The court held also that the value of the property was enhanced to the extent of $10,000 by the discharge of the mortgage lien and to the extent of $5,000 by the erection of improvements. It was therefore adjudged that a lien for $15,000 was justified.

There is no evidence as to the extent of the enhancement in value, except the inference that necessarily arises from the construction of a fine residence and the payment of a debt discharging a $10,000 lien. As a matter of course the property was enhanced in vendible value to the extent valid liens were discharged. But there is no testimony showing the extent of enhancement beyond

504

that sum. The lien adjudged to the bank was within the amount of the mortgage, and, since the mortgage was paid in 1925, the suit of the bank was filed within five years thereafter, and the court did not err in adjudging the bank a lien within the limit of $10,000, provided the claim of Mrs. Pierce that she was paid as a creditor of Pierce be disallowed. Mr. and Mrs. Pierce each testified as to the stock transaction, and they were corroborated in a way by the testimony of a train conductor. But it must be remembered that no note or evidence of the transaction was given and no account was kept. Mount v. Fourth Street Bank, 156 Ky. 503, 161 S. W. 220. It is obvious that the payments by Pierce were not made with any debt in mind, and no specific credit was given him by Mrs. Pierce. Assuming that he did owe the debt, Mr. Pierce had given his wife so much that upon an accounting in 1925 he would not have owed her as much as $10,000. It is argued that the payments to Mrs. Pierce on her pre-existing debt were no more than preferences which could not be assailed after the lapse of six months, as provided by sections 1910 and 1911, Kentucky Statutes. But we fail to find that the money was expended or intended as payments on any debt due Mrs. Pierce. Pierce made the contracts and caused the house to be built. Suits were pending against Pierce, and the mortgage of Mrs. Yancey was about to be enforced. It appears that Pierce raised the money to satisfy those insistent creditors, and he was not using it to pay Mrs. Pierce. He does not even say that he made such payments for such purpose. It may have been an afterthought to meet the attack of the creditors, and no doubt Pierce acted for the purpose of providing a nice home for his wife and not to pay her a contract debt. The lot was conveyed to Mrs. Pierce, and the deed was recorded more than five years before the suit was filed by the bank. The recording of the deed to Mrs. Pierce was constructive notice of her claim to the property, and there is nothing tending to prove that all the facts regarding the matter could not have been discovered then as well as later. The officers of the bank knew that Pierce lived in Elizabethtown, Ky. His contribution to the purchase price of the lot was not excessive considering his resources at that time. The transaction was negotiated through a real estate broker, and the payment by Pierce was made by check. No secrecy attended the transaction. It is clear that the circuit court correctly concluded that

the conveyance of the lot to Mrs. Pierce was not assailed in due season, even if it was avoidable at the time. Cogar. v. National Bank, 151 Ky. 470, 152 S. W. 278; Chinn v. Curtis, 71 S. W. 923, 24 Ky. Law Rep. 1563; Elkhorn Coal Corp. v. Hite, 225 Ky. 735, 9 S. W. (2d) 1083; Jennings v. Fain, 226 Ky. 290, 10 S. W. (2d) 1101; Fritschler v. Koehler, 83 Ky. 78.

But in this jurisdiction it is established that, when the money, property, skill, or labor of a husband has been employed to enhance the vendible value of his wife's property, his creditors have a right of action to subject the property to the satisfaction of an equity in their favor. Ely & Walker Dry Goods Co. v. Freedberg, 226 Ky. 713, 11 S. W. (2d) 964; Guthrie v. Hill, 138 Ky. 181, 127 S. W. 767; Patton v. Smith, 130 Ky. 819, 114 S. W. 315, 23 L. R. A. (N. S.) 1124; Blackburn v. Thompson, 66 S. W. 5, 23 Ky. Law Rep. 1723, 56 L. R. A. 938; Brooks-Waterfield Co. v. Frisbie, 99 Ky. 131, 35 S. W. 106, 18 Ky. Law Rep. 555, 59 Am. St. Rep. 452; Winfrey v. Winfrey, 150 Ky. 138, 150 S. W. 42.

The principle applied is that, where a right exists against the lands of another for the benefit of improvements placed thereon, equity allows a lien on the land to the extent only that the specific improvements have enhanced the vendible value of the property improved, but not to exceed the actual cost of the additions. Farley v. Stacey, 177 Ky. 109, 197 S. W. 636, 1 A. L. R. 1181; Combs v. Deaton, 199 Ky. 477, 251 S. W. 638; Leonard v. Williams, 220 Ky. 414, 295 S. W. 408; Jackson v. Claypool, 179 Ky. 662, 201 S. W. 2.

The lot of Mrs. Pierce was not liable for the debts of her husband; but, to the extent his expenditures had increased the vendible value of her lot, his creditors had a claim. The cause of action of the creditors in that respect accrued when the visible improvements were made, and, since the basis of the action is the fraud of the husband in diverting his resources from the discharge of his debts, the action must be brought within five years after the cause of action accrues, unless the fraud was not found out within that time. Kentucky Statutes, sec. 2519. The petition, if filed more than five, but within ten, years after the cause action accrues, must allege facts showing that the fraud was not discovered within five years, and, by reasonable diligence, could not have been discovered within that period. Forman v. Gault, 236 Ky. 213, 32 S. W. (2d) 977.

506

It appears that Pierce by the use of his own money and credit caused to be erected upon the land of his wife substantial and valuable improvements. He executed his notes and made payments as the work progressed, but the whole improvement was completed in 1921. The cause of action of his creditors then accrued, and no reason appears to excuse a failure to ascertain the facts at that time. The structure was a striking one, and necessarily called for the expenditure of considerable money. Mrs. Pierce was known to possess but limited resources. The creditors insist that the giving of notes by Pierce postponed the right to sue until the notes were actually paid. The argument manifestly misconceives the character of the cause of action and the nature of the remedy available to the creditors. They may not pursue the payments made by Pierce upon his notes. The law gives them a lien upon the land itself to the extent its value is enhanced by the improvements, and the remedy is available as soon as the improvement is completed. It would be no defense to a creditor's action for the husband to say that he had not paid for the improvements but only obligated himself therefor. A creditor knows when a house is built and may act upon that fact. If compelled to wait until a note given for the improvements was paid, he would never know, or have the means of learning, when his cause of action accrued. By renewal of the notes, the cause of action could be postponed indefinitely, and a discharge in bankruptcy would defeat the remedy altogether. The creditors' rights do not depend upon the ultimate payment by the husband of notes executed by him to pay for the improvements, but the remedy is complete when he causes the improvement to be made, or contributes to its construction. The credit of the husband, as well as his cash, may create an equity in favor of his creditors. Patton v. Smith, 130 Ky. 819, 114 S. W. 315, 23 L. R. A. (N. S.) 1124.

The cause of action of the creditors of an insolvent husband consists of a right to subject to the payment of his debts any increase in the vendible value of his wife's property traceable to the skill, energy, labor, money, or credit of the husband. Consequently the cause of action accrues to the creditors when the improvements are erected on the property belonging to his wife. The building of a house is a matter of notoriety, the structure can be seen by creditors, and they are not required to wait until the husband has paid those who may have trusted

him for the labor and material that entered into a structure placed on his wife's property. It follows that the cause of action for the improvements which the husband caused to be put upon the lot in 1921 was barred by limitation when this action was filed more than five years thereafter, and facts postponing the right, or excusing the delay to sue, were not alleged. Furthermore, there was no testimony tending to show the extent of any enhancement of the vendible value of the property by improvements placed thereon in 1921. It is not sufficient merely to show that money was expended for the purpose, but the evidence must show definitely and with reasonable certainty the extent to which the vendible value of the property has been augmented by the husband's exertions or expenditures.

Payment of the wife's mortgage by the husband, however, rests upon different considerations. The property was in lien to secure $10,000 due Mrs. Yancey. The debt originally may have been Pierce's, but, when his wife borrowed money upon the improved porperty, she became bound therefor, and her mortgage effectively bound the land. It was her debt, whatever she may have done with the money.

The payment in October, 1925, by Pierce was a diversion of his money and resources to the payment of his wife's debt, and constituted an infringement of the rights of his creditors.

It is clear that the discharge of a $10,000 mortgage lien resulted in an increase to that extent in the salable value of the porperty of Mrs. Pierce, and a cause of action accrued to the creditors of Pierce to the extent of the payment made by him on the mortgage debt.

The effect of the transaction was that the payment by Pierce upon the mortgage debt of his wife created in his existing creditors a right to be adjudged a lien on the land to the extent of such payment, and this action was filed within five years after that payment was made.

The appellees insist that the judgment for the benefit of the creditors of J. B. Pierce should include the sum paid by the husband upon his wife's debt with interest thereon from date of payment. The theory is that the creditors of Pierce were subrogated to the rights of the mortgagee, and if the debt had not been paid, interest thereon would have continued to run, and no hardship to Mrs. Pierce could result by requiring her to pay the exact amount for which she was liable if Pierce had not

paid it for her. We need not pause to consider the difficulties that would be encountered in an effort to enforce that theory, since the nature of the cause of action and the character of the relief available preclude its application. The creditors are entitled to be adjudged a lien on the property of Mrs. Pierce to the extent its vendible value was enhanced by reason of the payment by her husband. It may be presumed, as we have already stated, that the discharge of a valid mortgage enhances pro tanto the vendible value of the property, covered by the mortgage; but there is no presumption that the vendible value of such property continued to enhance proportionately with the accrual of legal interest upon a contractual obligation to pay money. Presumption is based upon truth and probability and the usual course of events. We know that property is as likely to depreciate as it is to appreciate in value, and we cannot presume that payment by Pierce in 1925 enhanced the vendible value of the land several years later to the extent of legal interest on the amount paid. All that can be done for creditors in cases of this character is to adjudge them a lien to the extent of the increase of the vendible value at the time. The cause of action of the creditors accrues when the wife's property obtains the benefit of the husband's expenditure, and if the enforcement of the lien is delayed, the loss of interest must be borne by the creditors unless, perhaps, a state of facts should be shown by the proof to justify the application of a different rule. Certainly there is no legal presumption of enhancement in the value of land equivalent to an interest charge on improvements made, or money paid, although the property was benefited at the time. The creditors must forgo interest until the demand is liquidated by a judgment. 33 C. J. p. 211, sec. 71. Cf. Schute Holtman & Co. v. Sweeney, 136 Ky. 773, 125 S. W. 180.

It follows that the judgment as to the claim of the People's State Bank & Trust Company was not erroneous, but that in favor of the trustee in bankruptcy of J. B. Pierce exceeded the amount authorized by the proof. The judgment should decree a lien on the land for the benefit of the creditors of Pierce to the extent only of the actual payment made by him, or with the money furnished by him, on the mortgage debt, less the amount adjudged to the People's State Bank & Trust Company.

The judgment is reversed in part, and affirmed in part, for proceedings not inconsistent with this opinion. Whole court sitting.