## Vest's Administrator et al. v. Vest et al.

(Decided May 30, 1930.)

POLK SOUTH, Jr., and BEN T. QUINN for appellants.

MORRIS & JONES and L. F. JOHNSON for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Preston Vest was a soldier in the World War. He died in France in 1918, intestate and unmarried. He left surviving him one brother, William Vest. At the time of his death he was carrying a $10,000 policy of war risk insurance issued by the federal government in which his brother, William Vest, was designated the beneficiary. Monthly payments of $57.50 were made under the policy to William Vest until his death in July, 1928. Thereupon Polk South, Jr., qualified as administrator of Preston Vest's estate, which consisted of the unpaid portion of the 240 monthly payments of insurance computed at present worth and amounted to $5,928, and which sum had been paid to him. He also qualified as administrator of the estate of William Vest, and, as administrator of the two estates, he brought this suit against those claiming to be heirs at law of Preston Vest and William Vest to have determined who is entitled to the war risk insurance of Preston Vest.

The appellees, Hallie Vest, Myrtle Vest, William Vest, Jr., and Gladys Vest, claim that Hallie Vest is the widow of William Vest, deceased, and that Myrtle Vest,

William Vest, Jr., and Glayds Vest are his children. The other appellees, who are uncles, aunts, and cousins of Preston Vest and William Vest, claim that William Vest and Hallie Vest were never married. The lower court adjudged that William Vest and Hallie Vest had been legally married and that the fund in the administrator's hands should be distributed one-half to the widow, Hallie Vest, and the remainder to such guardian as had been, or might be, appointed for the three children of William and Hallie Vest, who are infants under fourteen years of age.

The sole question presented is: Were William Vest and Hallie Vest legally married? Hallie Vest was the widow of Charles Savello and had three children by her first marriage. She owned a house and lot about one mile from Frankfort, Ky., and William Vest owned a house and lot in the same neighborhood. On May 18, 1923, she and William Vest, accompanied by her daughter, Aleen Savello, then about twelve years of age, and Annie Pardi, a friend and neighbor, went to Jeffersonville, Ind., with the intention of being married. Before leaving Frankfort they went to a jewelry store, where William Vest purchased a gold ring and presented it to Hallie Savello. After their return from Jeffersonville the ring was taken to the jewelry store and the initials "W. V." and "H. V." were engraved thereon. According to the testimony of Aleen Savello and Annie Pardi, the party of four went to Louisville, Ky., crossed the river to Jeffersonville, Ind., and went to the courthouse. William Vest had a conversation with a person apparently in charge of the clerk's office, but neither of the witnesses was able to say that he procured a marriage license, although they saw him and the person whom they presumed to be the clerk handling papers. They then went to a nearby office, presumably of a justice of the peace, where a marriage ceremony was performed. After their return to Frankfort, William Vest and Hallie Vest lived together as husband and wife until the former's death in 1928. Three children were born to them, all of whom were recognized by William Vest as his children. After 1923, William Vest and Hallie Vest each sold a strip of ground to Franklin county for a right of way for a state highway. She joined as his wife in the deed to his property; and he, as her husband, joined in the deed to her property. Their marriage was never questioned by any

of their friends, neighbors, or relatives, but they were recognized as husband and wife by all who knew them.

The sole circumstance tending to cast any doubt on their marriage is the absence of any record evidence. A search was made at the clerk's office at Jeffersonville, Ind., and in the offices of two justices of the peace in that city and no record of the marriage was found, although the clerk said he issued about 3,500 marriage licenses a year and admitted that sometimes he was unable to find records of licenses that had been issued.

It is well settled in this state that in the absence of any record evidence a marriage may be proven by parol evidence. In McDaniel v. McDaniel, 212 Ky. 833, 280 S. W. 145; 146, in which the facts were very similar to the facts here, it was said:

> "It is true that under the law of this state there must be a marriage in fact, and that common-law marriages are not recognized as valid. However, record evidence is not essential to a valid marriage. It may be proved not only by the record, but by persons who witnessed the ceremony. Also a presumption of marriage may arise from reputation. Thus where the parties have lived together ostensibly as man and wife for a long period of time, and have recognized and treated each other as such, and have been received into society and treated by their friends and relations as having and being entitled to that status, the law, in the interest of morality and decency, will presume that they have been legally married. Indeed, the most usual way of proving marriage except in actions for criminal conversation, and in prosecutions for bigamy, is by general reputation, cohabitation, and acknowledgment. Travers v. Reinhardt, 205 U. S. 423, 27 S. Ct. 563, 51 L. Ed. 865; Bartee v. Edmunds, 29 Ky. Law Rep. 872, 96 S. W. 535; Caldwell v. Williams (Ky.) 118 S. W. 932."

Also see Maryland Casualty Company v. Chamos, 203 Ky. 820, 263 S. W. 370; Scott v. Scott, 200 Ky. 153, 252 S. W. 1019; Jackson v. Claypool, 179 Ky. 662, 201 S. W. 2.

Where a marriage ceremony is shown, every presumption will be indulged that it was legally performed. The rule is thus stated in 18 R. C. L. 416, sec. 39:

> "The law and public policy favor matrimony, and when the celebration of a marriage is once

shown, the contract of marriage, the capacity of the parties, and, in fact, everything necessary to the validity of the marriage, in the absence of proof to the contrary, will be presumed. It will be presumed that the person assuming to officiate at the ceremony was authorized to perform it, and that a license was properly issued. This presumption of legality is said to be one of the strongest known to the law, especially where the legitimacy of children is involved, for the law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy."

The recent case of Helm v. Goin, 227 Ky. 773, 14 S. W. (2d) 183, is relied on as announcing a contrary rule, but the question there was whether or not a child was legitimate. The child was born when her mother was living with her husband, J. W. Hulette. Walter Goin was the putative father of the child and because, after her birth and after the separation of her mother and Hulette, Goin declared that he and her mother were married, it was claimed that she was entitled to take by descent from him as his child under section 1398, Kentucky Statutes, which provides that: "If a man having had a child by a woman shall afterwards marry her, such child or its descendants, if recognized by him before or after marriage, shall be deemed legitimate." It was admitted that Goin and her mother were not married at the time she was born, and it was held that the burden was on her to show a subsequent marriage to bring her within the statute, which she failed to do, since no marriage license was ever issued to Goin and her mother and no witness who testified was present at the marriage or knew anything about it.

In the instant case the mere absence of record evidence of the marriage should not be permitted to overcome the presumptions flowing from the proven facts. Whether or not the lower court properly distributed the fund in the hands of the administrator among the appellees is not presented, since none of the appellees is complaining.

The judgment is affirmed.