## Todd v. Bowman.

Jan. 17, 1941.

Haynes Carter for appellant.
John A. Huffaker for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Andrew Todd, colored, died intestate in October, 1935, leaving neither widow nor child. Mary Bowman, admittedly the child of a sister, qualified as administratrix. Intestate at death owned some personal property and three small city lots. The appellant filed his petition making appellee defendant, seeking a settlement and an adjudication entitling him to a one-half interest in the residue of the property, admitting the right of Mary Bowman to one-half. His claim is based on the assertion that John Todd was a brother of Andrew, and that he was John's legitimate son. He says that Mary Bowman refused to join him in a proposal for a voluntary sale and division of proceeds after payment of debts and expenses.

Mary's refusal, as evidenced by her answer, was based on her assertion that Richard was not John's son. This apparently joined issue, and the matter was referred to a commissioner to hear proof and determine the question as to whether or not Richard was a legitimate son of John and nephew of Andrew Todd, and for proof of other matters, such as divisibility of the property, debts, expenses, etc., not pertinent to the question to be considered.

The commissioner reported that seven witnesses had stated that they had known the two brothers from the time of the birth of Richard, and were positive that Richard "was the legitimate son of John." That their testimony bore on "all facts concerning the life of John Todd and Mary Griffin, mother of Richard. From the testimony of these witnesses * * * the fact appeared to be established that Richard is the legitimate son of John Todd." The defendant "introduced eight witnesses, among them a niece of John Todd, and each of these witnesses testified that John was never married, and that Richard was not the son of John."

Appellee filed exceptions to the report, and the chancellor sustaining same directed the dismissal of appellant's petition, over objection and exception. This order was entered on the 10th day of June, 1937; appellant on June 6, 1939, just a few days before expiration of statutory time, filed a copy of the judgment in our clerk's office, later his transcript, and still later, by

agreement, making the chancellor's opinion a part thereof.

Reviewing the testimony offered by plaintiff, we find that he is about forty-three years of age. John died when Richard was about five years old; the mother, whose maiden name was Carrie Griffin, was sometimes called "Carrie Anderson" or "Carrie Todd." She died in 1915, and a copy of vital statistic's certificate shows she was buried under the name of Anderson. While some of the evidence given by Richard was perhaps technically incompetent, no serious question is raised on this score.

Richard said that he visited Andrew Todd, though with what frequency is not shown, and that he called him "uncle," and Andrew referred to him as "nephew." That his uncle furnished him "part" of his books, and helped him otherwise when he was in school. He filed as part of his proof what appears to be a bona fide, honorable discharge of Richard Todd from the United States Army, of date January 25, 1919. He also said that he attended the common schools, and for a while a high school. He made effort to locate certain records of the common school, which he said would show him listed as "Richard Todd." He was informed, as he said, that the records were destroyed in the 1937 flood. He did not attempt to locate the high school records.

Rebecca Hays, upon whose testimony appellant places much reliance, was acquainted with both John Todd and Carrie Griffin at the time of and before Richard was born; she says, "Carrie was said to have married John." That Carrie was about fifteen years old when she and John began going together, and Richard was born at her mother's home. It may be gathered from part of her recital, though not shown elsewhere, that Richard was born in wedlock, if there was in fact a marriage. Rebecca gives her version thuswise:

"Well, I will tell you how it was; you know how it is when young girls first gets in bad luck; the old folks didn't make any great to do about it like they do now, running to the courthouse and straightening up things. Mrs. Todd and Carrie's mother got together and talked things over, and John and Carrie was supposed to get married. After it was over Carrie and John came to my mother's house and

lived and Richard was born there. Three years after that John goes to his mother's and lives— with his father and mother, and this girl's mother was John's sister, she married Mr. Johnson."

She says that Carrie and John said they were married, and lived together for nearly three years, and John recognized Richard as his son. Evidently aunt Rebecca's idea of "marriage" harked back to days of slavery, or it was perhaps her notion that ceremonial was not prerequisite to a legal marriage, since she said, after detailing the facts above: "Of course, they didn't have any wedding." And we accept this as practically closing debate as to there having been a ceremonial wedding.

Other witnesses, four or five in number, apparently all respectable colored people, testified mainly as to matters and acts which go no further than an effort to establish marriage by reputation. Like Rebecca Hays, they testified in such a way as to allow us to summarize that John and Carrie both stated that they were married; introduced each other to others as husband and wife; that the reputation amongst their neighbors was that they were married, and recognized Richard as their son, and some scant testimony that Andrew made gestures which indicated he believed Richard was his nephew, but nothing on his part to manifest the knowledge or belief that John and Carrie were married. So, up to this point we find nothing more than mere presumption that they were married; in fact, the testimony of the most emphatic witness is to the effect that there was no marriage.

On the other hand, we have the testimony of the appellee, admittedly a legitimate niece of Andrew; she was forty-three years of age and had been a school teacher for twenty-one years; she knew her uncle John slightly. She was with Andrew during his last illness, and was with him every week, attending to his business affairs. Prior to the institution of the suit by Richard she had never heard of him. He never visited her or her uncle's family. She did not know Carrie.

Mary's father, seventy-four years of age, saw John Todd nearly every day of his life. John lived with his father and mother. He was positive that John was never married, or had a child, or children. John Turk, seventy-three, worked with John on the railroad; he had

never heard of his having been married, or claiming a child. John Buckner had known John for forty-five years; saw him every day. He had never heard of his being married or claiming fatherhood, or that he ever lived with Carrie Griffin as her husband. There are several others, friends and acquaintances of John, who give testimony of like import.

Several of the witnesses, who knew both John and Carrie, testified that Carrie's reputation for chastity was not good; such testimony relates to periods both before and after the birth of the son, and is not denied, nor are any of the witnesses impeached. It was shown that Carrie had been convicted of a felony. Again it is pretty well established that notwithstanding Rebecca Hays said she was not a sister of Carrie, she was a sister.

The only witness who throws any light on the circumstances in relation to the birth of Richard, and the supposed marriage of John and Carrie, is Rebecca Hays; her testimony shows that Richard was born after the supposed or claimed marriage of the parties. Construing Section 1397, Kentucky Statutes, we have more than once held that an illegitimate child, while he may take by inheritance from his mother, is incapable of inheriting from the putative father, unless the father shall afterwards marry the mother, recognizing the child, either before or after the marriage. Willoughby v. Motley, 83 Ky. 297; Stein's Adm'r v. Stein, 106 S. W. 860, 32 Ky. Law Rep. 664; Kimmel v. Williams, 217 Ky. 671, 290 S. W. 483.

In the last named case we found that appellant's evidence went no further than to show that she was a daughter of the putative father; there was evidence which showed that her father was married only one time, and the appellant was the daughter of another woman to whom the father was never married. We held the evidence was sufficient to establish illegitimacy.

In this and many other cases we find that marriage is a necessary prerequisite to the establishment of legitimacy. This prerequisite may be established in two ways: By proof of a ceremonial marriage or common-law marriage in a jurisdiction where such is recognized, accompanied by such facts and circumstances as manifest that the parties are man and wife. An exam-

ple is in the recent case of Hoffman v. Hoffman, decided December 6, 1940, 285 Ky. 55, 146 S. W. (2d) 347.

There is no claim here that there was a common-law marriage in another State. The assumed marriage could not come under the class of slave marriages, and in this case counsel has relied on the cases which we have frequently written, wherein there was in fact a common-law marriage, consummated in a state recognizing such. Scott v. Scott, 200 Ky. 153, 252 S. W. 1019, is a fitting example. We need not recite the facts. Appellant also relies on Adkins v. Bently, 177 Ky. 616, 197 S. W. 1086. In that case appellant claimed to be the legitimate daughter of Jackson Moore. Her claim was sharply contested. There was in that case a showing (though erroneously rejected in proof) that the father and mother had been married in Virginia. This we found, in addition to the proof of continuous living together in the community in such a manner as sustained the relationship by reputation and recognition, to sufficiently establish legitimacy, citing Rockcastle Mining Co. v. Baker, 167 Ky. 66, 179 S. W. 1070, cited and relied upon by appellant, and which upon casual analysis is easily distinguished. The contest related to a title to land which had been conveyed by Emeline Gardner to one Hubbard. Baker, a creditor of Emeline, sought to have the deed declared void because, as he asserted, she was married at the time of execution of the conveyance, and her husband did not join. We held the parties to have been husband and wife in the legal sense. The proof showed that the parties had begun their illicit relations in Kentucky many years ago. They continued such relations in both Ohio and Indiana, and long after moving back to Kentucky. They had lived together as husband and wife from 1860 to 1892, the date of the deed. They also claimed to have been ceremonially married in Ohio in 1860. No record was introduced, but it was shown that many of the marriage records were destroyed by fire in 1884. While the opinion does not so clearly state, it may well be inferred that the continuous living together of the parties in Ohio constituted a common-law marriage, hence valid in our Commonwealth.

Here the situation is different; we cannot characterize the evidence of appellee here as weak or flimsy. It was, as we view it, of sufficient weight and quality to overcome the presumption of ceremonial marriage of

John and Carrie, which arises only from a recitation of incidents as tend to indicate no more than a common-law marriage.

It is at once noticeable that there is an entire lack of evidence of the character necessary to establish the relation of husband and wife, to the extent prerequisite to hold legitimacy. There was no effort apparently to search the records to ascertain if parties had obtained a license; there was no effort to show that there had been any movement toward any sort of ceremony, nor to see if there was a return of the marriage certificate as required by statute. However, there is reason for such failure, as is shown by the evidence of aunt Rebecca Hays, when she says they did not repair to the courthouse "like folks do now," but just considered themselves married without license or ceremony. In this case it may be doubted whether the proof was sufficient to establish a marriage by reputation, since one of the elements to be considered is the living together, ostensibly as man and wife, for a long period of time. McDaniel v. McDaniel, 212 Ky. 833, 280 S. W. 145, 146. There was a lack of evidence that John and Carrie ever lived together before it became apparent that a child was on the way. The proof as to living together thereafter is unsatisfactory, and does not cover an appreciable period.

In the McDaniel case, supra, we said:

"It is true that [in] * * * this State there must be a marriage in fact, and that common-law marriages are not recognized. * * * However, record evidence is not essential to a valid marriage. It may be proved not only by the record, but by persons who witnessed the ceremony."

In this case the parties had said they were going away from home to marry. There was evidence of the issuance of license, but no record of a return. When the parties returned home they said they had been married, and thereafter "for many years lived together * * * as man and wife." We held the facts sufficient; a witness also said she had been present at the ceremony. Vest's Adm'r v. Vest, 234 Ky. 587, 28 S. W. (2d) 782, is a fair example of what we deem sufficient to establish a legal ceremonial marriage.

In Helm v. Goin, 277 Ky. 773, 14 S. W. (2d) 183, we

had the question of the legitimacy of a child born before wedlock. It was admitted that the parties were not married at the time the child was born, but claimed that they afterwards married, and we held the burden to be on the claimant to establish subsequent marriage to bring her within the statute (Kentucky Statutes, Section 1398), which she failed to do, since no marriage license was ever issued to Goin, and her mother had no witness who testified or was present at the marriage, or knew anything about it. In Maryland Casualty Co. v. Chamos, 203 Ky. 820, 263 S. W. 370, citing in point Faustre v. Com., 92 Ky. 34, 17 S. W. 189, 13 Ky. Law Rep. 347, we held that the fact of marriage might be proven by parol testimony of persons who had actual knowledge of the fact, ''and the same reason for the admission of such testimony to prove that fact would also prevail to establish the fact of birth, since there is no difference in principle between the two issues.''

Without further lengthening the opinion, we adopt the language of the chancellor, who summarized the evidence more fully than we have undertaken so to do:

''The rule that the law will presume a person to be legitimate under certain circumstances, is based upon the well established rule of evidence that a fact has been proven which leads to and will support the presumption or inference. The evidence in the case at bar does not measure up to the facts on which the court inferred marriage in the cases cited by plaintiff.''

The chancellor might have well added that the facts in the instant case fell short of such as are necessary in establishing a common-law marriage. However, if we be in error in this assumption, it is sufficient to say that if there be inference or presumption present, it was amply met by countervailing evidence.

We are convinced that the chancellor reached a correct conclusion. If there were no more than doubt in our minds, we would be compelled under our rules to affirm the judgment. Gilbert v. Gilbert, 275 Ky. 559, 122 S. W. (2d) 137.

Judgment affirmed.