Daniel **PINKHASOV**, Appellant,

v.

Anna **PETOCZ**, Appellee.

No. 2008–CA–002420–MR.

Court of Appeals of Kentucky.

Jan. 28, 2011.

Allen McKee Dodd, Louisville, KY, for appellant.

J. Michael Smither, Louisville, KY, for appellee.

Before NICKELL, MOORE and WINE, Judges.

## OPINION

NICKELL, Judge:

Daniel Pinkhasov appeals from two orders of the Jefferson Circuit Court, Family Court Division, holding that he and Anna Petocz had entered into a legally valid *de facto* marriage on July 10, 2005. The trial court found "no statutes relating to marriage that would indicate that the legislature intended that the validity of a marriage is conditioned on applying for, obtaining, signing, or filing a certificate of marriage license" and held "a failure to obtain and/or return for filing with the county clerk a license or certificate of marriage does not void or invalidate an otherwise valid marriage." Further, even though Pinkhasov and Petocz had failed

to obtain a marriage license and had excluded solemnization of a civil[1] marriage from their religious marriage ceremony, the trial court held they had nevertheless established a valid and legally recognized "*de facto* marriage." On appeal, Pinkhasov argues no valid civil marriage was ever intended and none ever existed between Petocz and himself under Kentucky law because the parties did not meet the requirements of the Kentucky Revised Statutes (KRS). Pinkhasov further argues the trial court erred in holding that a legally valid *de facto* marriage had been established on July 10, 2005, because the term "*de facto* marriage" is synonymous with a common-law marriage and Kentucky does not recognize common-law marriage. After careful review of the briefs, the record and the law, we reverse and remand for entry of an order consistent with this Opinion.

## FACTS AND PROCEDURAL BACKGROUND

In the early part of 2005, Pinkhasov and Petocz initiated a dating relationship which became intimate. As a result, a child was conceived.

In late June 2005, Pinkhasov and Petocz approached Rabbi Avohom Litvin and asked that he perform a Jewish marriage ceremony consistent with the laws, customs, and traditions of the Jewish faith, but without a "secular, legal marriage contract." In particular, the parties did not wish for any civil marriage license or marriage certificate to be secured, executed or filed. Neither party was an American citizen, and Rabbi Litvin understood their desire to avoid a civil marriage was based upon immigration concerns and a need to remain legally free to marry American citizens for the purpose of applying for citizenship.

Rabbi Litvin confirmed that Jewish religious law does not require that a civil marriage license be obtained and executed, or that certification of the marriage ceremony be filed with a governmental clerk, for the establishment of a valid marriage. Even so, his attempts to convince Pinkhasov and Petocz to be contemporaneously married in accordance with the mandates of both Jewish religious law and civil law were unsuccessful.

On July 10, 2005, Rabbi Litvin presided over a highly ritualistic orthodox Jewish wedding ceremony for the couple in Jefferson County, Kentucky, in the presence of more than one hundred family, friends, and guests. Rabbi Litvin solemnized the Jewish religious ceremony in accordance with all laws, customs, and traditions of their faith. During the ceremony, the "Ketubah"[2] was written and executed by the parties in the presence of the required Jewish witnesses, a plate was ritualistically broken, and Pinkhasov performed the ceremonial act of lowering the veil over Petocz's face. Thereafter, the parties and assemblage joined in other traditional Jewish acts related to marriage at a reception.

Though he is a person authorized to solemnize civil marriages in the Commonwealth of Kentucky, Rabbi Litvin testified he did not solemnize a civil marriage on July 10, 2005, pursuant to the insistence of both Pinkhasov and Petocz. Instead, in solemnizing only the Jewish religious mar-

---

1. "Civil," as used herein, means "[o]f or relating to the state...." *Black's Law Dictionary* 279 (9th ed.2009).

2. The "Ketubah" is "a formal Jewish marriage contract that provides for a money settlement payable to the wife in the event of divorce or at the husband's death." Bottom of Form *Webster's Third New International Dictionary, Unabridged.* Merriam–Webster, 2002 (http://unabridged.merriam-webster.com (27 Nov. 2010)).

riage formalities, Rabbi Litvin omitted that portion of the ceremony during which a civil marriage license is routinely executed before the requisite witnesses and any language referencing the establishment of a civil marriage.

Both Pinkhasov and Petocz admit they did not apply for or obtain a civil marriage license nor cause a marriage license or marriage certificate to be executed and filed with the Jefferson County Court Clerk. Rabbi Litvin confirmed that Pinkhasov and Petocz directed him not to sign or file documentation with the county clerk's office certifying that a marriage of any kind had taken place and, in keeping with their instructions, he did not do so. Thereafter, a son was born to the parties in September of 2005, and they continued to live together until about October 6, 2007.

On November 13, 2007, Petocz petitioned the trial court for dissolution of marriage. A few months later, Pinkhasov moved to dismiss the dissolution action, but urged the trial court to resolve pending custody and child support issues. In July of 2008, the trial court heard arguments on whether a valid civil marriage ever existed between the parties. Pinkhasov testified he never intended to be legally married to Petocz under the laws of the Commonwealth of Kentucky, and never considered them to be legally married. Petocz, however, testified she believed the couple was, in fact, legally married following the July 10, 2005, Jewish religious marriage celebration performed by Rabbi Litvin.

In support of his contention that the couple intended to be married in the eyes of the Jewish faith but *not* under Kentucky law, Pinkhasov argued that: he and Petocz never held themselves out to be husband and wife after the marriage celebration; Petocz did not take his last name as her own; the couple never filed joint tax returns; Petocz stated on a passport application that she had never been married; Petocz had listed Pinkhasov's marital status as "single" on an apartment application; and Petocz had identified Pinkhasov as her "religious husband, not legal" on mental health records. In contrast, both Petocz and Rabbi Litvin testified that Pinkhasov and Petocz *had* subsequently held themselves out to be husband and wife to the Jewish congregation and their community.

In an order dated August 12, 2008, the trial court denied Pinkhasov's motion to dismiss the dissolution action. The trial court found that Pinkhasov and Petocz had "participated in a Jewish wedding ceremony" memorialized by their Ketubah; acknowledged their intent to be husband and wife to each other and before Rabbi Litvin, the required Jewish witnesses, and their family and friends; lived together after the wedding ceremony; and thereafter held themselves out to be husband and wife. Finding "no statutes relating to marriage that would indicate that the legislature intended that the validity of a marriage is conditioned on applying for, obtaining, signing, or filing a certificate of marriage license," the trial court held

> a failure to obtain and/or return for filing with the county clerk a license or certificate of marriage does not void or invalidate an otherwise valid marriage. The language of KRS 402.080 (no marriage to be solemnized without license) and KRS 402.220 (person solemnizing marriage to return certificate to clerk) do not reflect that obtaining and/or returning to the county clerk are prerequisites to valid marriage.

Even though Pinkhasov and Petocz had failed to obtain a marriage license, had specifically excluded Rabbi Litvin's solemnization of a civil marriage from their reli-

gious marriage ceremony, and had caused Rabbi Litvin not to sign or file a certification of the marriage ceremony with the county clerk, the trial court held the parties had nevertheless established a legally valid "*de facto* marriage" at the time of their July 10, 2005, religious marriage ceremony.

Thereafter, in an order dated December 1, 2008, the trial court denied Pinkhasov's request for reconsideration of its previous order, finding no factual or legal basis upon which to change its earlier ruling. The trial court recognized that KRS 402.080 prohibits the solemnization of any marriage without a marriage license. However, the trial court reasoned that a marriage so conducted is not void if solemnized or contracted in the presence of a person or society authorized under KRS 402.020(1)(c), since KRS 402.070 states

> [n]o marriage solemnized before any person professing to have authority therefor shall be invalid for the want of such authority, if it is consummated with the belief of the parties, or either of them, that he had authority and that they have been lawfully married.

The trial court held that "while Rabbi Litvin may not have had authority to solemnize this marriage because a marriage certificate was not obtained under KRS 402.080, the marriage was valid because the Jewish wedding ceremony was performed while Ms. Petocz believed that Rabbit (sic) Litvin had such authority." The trial court went on to conclude

> [i]n their wedding plan discussions with the Rabbi both parties indicated that they wished for the child to be raised in the Jewish faith and the parties were undoubtedly taking steps to insure that the child was born a legitimate child. Mr. Pinkhasov cannot have it both ways. His actions and conduct surrounding and during the July 10, 2005[,] Jewish

wedding ceremony, as well as his actions and conduct after the marriage now prevent him from claiming that the parties are not married, in order to circumvent the dissolution laws of the Commonwealth.

> In summary, on July 10, 2005[,] both parties fully participated in a Jewish wedding ceremony which was memorialized by their written "Ketuba" [sic] (Bill of Marriage). In that Jewish wedding ceremony[,] both parties acknowledged to one another and before Rabbi Litvin, each of their families, the required number of Jewish witnesses, and in a celebration before witnesses and several invited guests[,] of their intention to be husband and wife. Mr. Pinkhasov and Ms. Petocz lived together as husband and wife, a child was born to them, and they held themselves out to the Jewish community, members of their congregation, and others[,] as husband and wife. Therefore, based on the evidence the Court will confirm it[s] ruling that the parties were married on July 10, 2005.

Pinkhasov appeals from both orders. We reverse and remand.

## LEGAL ANALYSIS

■ The issue presented in this case is whether Pinkhasov and Petocz were ever legally married under the civil laws of the Commonwealth of Kentucky. If a legally valid civil marriage existed, the parties would be subject to the rights and obligations arising under our dissolution laws; but if not, the parties would not. Here, we first address the question of whether a purely religious marriage ceremony, solemnized pursuant to the tenets of a particular religious faith but without prior issuance of a civil marriage license as required by Kentucky statutory law, creates a legally valid civil marriage under the laws of the Commonwealth of Kentucky. We con-

clude it does not.[3] Next, we address the question of whether the trial court erred in holding the parties had established a legally valid "*de facto* marriage." We conclude it did.

## I. STANDARD OF REVIEW

This case was tried by the trial court sitting without a jury. Thus, our standard of review regarding the trial court's findings of fact is expressed in CR[4] 52.01, which directs that its factual findings "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." However, we owe no deference to the trial court's conclusions of law, which we review *de novo*. *Gosney v. Glenn*, 163 S.W.3d 894, 898 (Ky. App.2005). The essential facts in the present case are not in dispute, and we have no quarrel with the trial court's factual findings. However, we disagree with the trial court's legal conclusions.

## II. NO LEGALLY VALID STATUTORY MARRIAGE

■ The issues confronting us in the present case arise in the context of parties who knowingly and intentionally evaded and disregarded statutory mandates for establishing a legally valid civil marriage, particularly including their duty to initially obtain a license to be civilly married within Kentucky. Instead, they opted to participate in a purely religious marriage ceremony celebrated by their rabbi before a gathering of family and friends. Contrary to the explicit advice of their rabbi, the parties chose not to secure the requisite civil marriage license in advance of their marriage ceremony. For whatever reason, they demanded their rabbi solemnize a marriage ceremony solely in accordance with the laws of their Jewish faith, with no reference to, witnessing, or certification of, a civil marriage. They further insisted their rabbi sign and file no certification or recording of any marriage ceremony with any civil authority.[5] The trial court found the parties thereafter cohabited, gave birth to a son, and held themselves out to their community as husband and wife, prior to the souring of their relationship. Based on these facts, the trial court determined the parties had established a valid "*de facto* marriage" under Kentucky law.

■ It is axiomatic that states have absolute jurisdiction over the regulation of the institution of marriage. *Rowley v. Lampe*, 331 S.W.2d 887, 890 (Ky.1960); 15 Louise E. Graham & James E. Keller, *Kentucky Practice–Domestic Relations Law* § 3.1 (2010) (Marriage—State Ability to Regulate). In *Rowley*, our former Court of Appeals stated that

[t]he rights and obligations of a marriage do not depend upon an agreement

---

3. Nothing in this Opinion should be construed as a comment upon the validity of a marriage, or lack thereof, pursuant to the tenets or doctrines of any particular religion, religious society, or personal belief system.

4. Kentucky Rules of Civil Procedure.

5. In doing so, it appears the parties were attempting to circumvent the marriage laws of the Commonwealth of Kentucky with the intent to gain an advantage relative to the federal laws of immigration and/or citizenship. We disagree with the trial court's conclusion in its December 1, 2008, order that

"the parties were undoubtedly taking steps to insure that the child was born a legitimate child," since Pinkhasov and Petocz could have easily avoided any doubt as to his status by simply complying with their rabbi's learned advice that they obtain a statutorily mandated civil marriage license and be contemporaneously legally married pursuant to civil law during the otherwise religious ceremony, as was his common practice. For whatever reason, they did not and no valid civil marriage resulted pursuant to Kentucky statutory law.

between the parties but upon the law of the domiciliary state, because the institution is one of society which is regulated by public authority.

331 S.W.2d at 890 (citing *Maynard v. Hill,* 125 U.S. 190, 205, 8 S.Ct. 723, 726, 31 L.Ed. 654 (1888)). In *Maynard,* the Supreme Court of the United States held:

[m]arriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

125 U.S. at 205, 8 S.Ct. at 726.

The absolute legislative authority of the states over the establishment of legally valid marriages is not contrary to constitutional provisions against the establishment of religion or those prohibiting the free exercise thereof. As was stated in *Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244 (1878) (regarding bigamy), "Congress was deprived of all legislative power over mere *opinion,* but was left free to reach *actions* which were in violation of social duties or subversive of good order." (Emphasis added). In short, though laws cannot interfere with one's religious belief and opinions, they may interfere with one's practices. *Id.* at 164–65. As such, a party's religious belief cannot be accepted as a justification for committing an overt act in contravention of civil law. "The claim of religious freedom cannot be extended to make the professed doctrines superior to the law of the land and in effect to permit every citizen to become a law unto himself." *Jones v.*

*Hallahan,* 501 S.W.2d 588, 590 (Ky.App. 1973) (citing *Reynolds* ).

When construing statutes, courts are guided by KRS 446.080(1), which provides, in part, that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature." Thus, our duty is

to ascertain and give effect to the intent of the General Assembly. We are not at liberty to add or subtract from the legislative enactment nor discover meaning not reasonably ascertainable from the language used.

*Beckham v. Board of Education of Jefferson County,* 873 S.W.2d 575, 577 (Ky.1994) (citing *Gateway Constr. Co. v. Wallbaum,* 356 S.W.2d 247 (Ky.1962)).

Moreover, KRS 446.080(4) provides, in part, that "[a]ll words and phrases shall be construed according to the common and approved usage of language." "[C]ourts have a duty to accord statutory language its literal meaning unless to do so would lead to an absurd or wholly unreasonable result." *Johnson v. Branch Banking and Trust Company,* 313 S.W.3d 557, 559 (Ky. 2010). The interpretation of a statute is a matter of law, and as a reviewing court we are not required to adopt the decisions of the trial court as to a matter of law but must interpret the statute according to the plain meaning of the act and in accordance with the legislative intent. *Floyd County Bd. Of Educ. v. Ratliff,* 955 S.W.2d 921, 925 (Ky.1997). "When the words of a statute are clear and unambiguous and express the legislative intent, there is no room for construction or interpretation and the statute must be given its effect as written." *McCracken County Fiscal Court v. Graves,* 885 S.W.2d 307, 309 (Ky. 1994) (citations omitted).

■■ The statutory requirements enacted by the Kentucky legislature regulating the establishment of a legally valid civil marriage within the Commonwealth are concise and unambiguous. In general, marriage has been defined as the legal union of a couple as spouses, and the essentials of a valid marriage have been identified as: (1) parties legally capable of contracting to marry; (2) mutual consent or agreement; and (3) an actual contracting in the form prescribed by law.[6] More particularly, Kentucky's statutory definition of marriage is set forth in KRS 402.005, which provides:

> [a]s used and recognized in the law of the Commonwealth, "marriage" refers only to the *civil* status, condition, or relation of one (1) man and one (1) woman united *in law* for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex.

(Emphasis added). Kentucky's statutory definition of marriage is clear on its face, and we believe, susceptible to but a singular interpretation. In Kentucky, a legally valid civil marriage unites one man and one woman in a particular state, condition, or relationship for life "by force of law";[7] that is, pursuant to all statutory requirements as interpreted and applied by relevant caselaw. A legally valid civil marriage which follows all statutory requirements and has been solemnized before an authorized religious or civil official is commonly referred to as a "ceremonial marriage."[8] *Carroll v. Carroll,* 251 S.W.2d 989, 990 (Ky.1952).

■ Kentucky law favors marriage, *Griffith v. Lunney,* 300 Ky. 66, 68, 187 S.W.2d 431, 433 (1945), and "[w]here a marriage ceremony is shown, every presumption will be indulged that it was legally performed." *Vest's Adm'r v. Vest,* 234 Ky. 587, 28 S.W.2d 782, 783 (1930). In *Vest,* which held parol evidence was sufficient to prove a legally valid civil marriage between a deceased and one claiming as his widow, notwithstanding the absence of record evidence, our former Court of Appeals quoted 18 R.C.L. 416 § 39, stating:

> [t]he law and public policy favor matrimony, and when the celebration of a marriage is once shown, the contract of marriage, the capacity of the parties, and, in fact, everything necessary to the validity of the marriage, *in the absence of proof to the contrary,* will be presumed. It will be presumed that the person assuming to officiate at the ceremony was authorized to perform it, *and that a license was properly issued.* This presumption of legality is said to be one of the strongest known to the law, especially where the legitimacy of children is involved, for the law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy.

*Id.* (Emphasis added). Likewise, in *Potter v. Stanley,* 187 Ky. 292, 219 S.W. 167, 170 (1920), the court upheld a marriage where it was undisputed that a marriage ceremony had been properly solemnized, although the marriage license and the certification of the officiant who had solemnized the marriage ceremony had been mislaid or destroyed,[9] and no one could testify as to the exact date of the marriage ceremony.

---

**6.** *Black's Law Dictionary* 1059 (9th ed.2009).

**7.** *Black's Law Dictionary* 857 (9th ed.2009).

**8.** *Black's Law Dictionary* 1062 (9th ed.2009).

**9.** Our research has revealed no indication in any of the statutes relating to marriage that the Legislature intended that the legal validity of a civil marriage be conditioned upon the recording of the marriage certificate by the parties. KRS 402.220 merely requires the

■ While such a presumption of a legally valid civil marriage is one of the strongest presumptions known in the law, it may be indulged only so long as there is no substantial evidence to the contrary; but when that is offered, the presumption disappears and the issues must be decided on the evidence. *Carroll,* 251 S.W.2d at 991. In *Carroll,* our former Court of Appeals affirmed the trial court's finding that the surviving woman had failed to prove her allegation of a "ceremonial marriage" in Ohio but reversed the trial court's finding that a common-law marriage had been consummated in Florida. In holding "where the relationship is meretricious in its inception, it will be presumed to continue so in the absence of evidence to the contrary," the Court stated:

> [w]e are reluctant to hold that these people were not married, but the same reasons which impel the Courts to protect the marriage institution preclude us from making any exception in favor of those who disregard the solemnities which experience has proved are necessary to protect the sanctity of that institution.

*Id.* (Citations omitted). Though recognizing the surviving woman may have believed in good faith she was married, the Court determined the evidence would not sustain such a finding.

■ Thus, while every presumption will be indulged to support finding a legally valid civil marriage, parties may not disregard statutorily mandated solemnities, and the strongest presumption must yield to uncontroverted evidence. With the foregoing legal criterion to guide us, we now turn to the case *sub judice.*

■ KRS 402.080 declares "[n]o marriage shall be solemnized without a license therefore." In construing this succinct and unambiguous statutory language, we hold the General Assembly intended two essential requisites of a legally valid civil marriage which are inviolable. First, the parties intending to be married must obtain a marriage license from a county clerk. Second, having obtained a marriage license, the parties intending to be married must solemnize their intent to be married before a person or society believed in good faith to possess authority to solemnize the marriage. While functionaries, such as county clerks and marriage officiants, who contravene statutorily imposed duties relative to the licensing, establishment, and recording of a legally valid civil marriage may be exposed to penalties under KRS 402.990, conformity with the two foregoing requirements deduced from KRS 402.080 is entirely within the power, control, and responsibility of the parties intending to be legally married, and we hold strict compliance therewith is necessary for the establishment of a legally valid and binding civil marriage.

In the present case, it is undisputed that Pinkhasov and Petocz did not apply for, or otherwise obtain, a marriage license from the Jefferson County Court Clerk's office prior to Rabbi Litvin's performance of the purely religious marriage ceremony they demanded. Petocz knew a marriage license was necessary for legally establishing a civil marriage. She had contacted the county clerk's office about obtaining a marriage license but thereafter intentionally failed to secure one with Pinkhasov. Further, she ignored Rabbi Litvin's advice

---

officiant *solemnizing the marriage to return the certified marriage license to the appropriate county clerk within one month of performing the marriage ceremony. The statute places the duty solely on the person who*

performs the ceremony to deliver the marriage certificate to the county clerk, and failure to perform that duty shall result in that person being guilty of a violation pursuant to KRS 402.990(11).

that the parties obtain a marriage license and conform to the mandated solemnities for a civil marriage. Instead, both she and Pinkhasov directed Rabbi Litvin to solemnize a purely religious marriage ceremony, based solely upon the law of their Jewish faith, with no reference to the establishment of a civil marriage and absent certification or filing of any legal record documenting any marriage ceremony, religious or civil.

 For whatever reason, it is clear both Petocz and Pinkhasov intentionally strategized and sought to circumvent the intent, effect, and force of Kentucky's statutes concerning legally valid civil marriage. Because both flagrantly disregarded the statutory requisites, neither can now reasonably argue that a legally valid civil marriage was ever intended, effectuated or supposed. Though a purely religious marriage ceremony was solemnized by Rabbi Litvin, the uncontroverted proof establishes that no marriage license was ever obtained, and on that basis alone any presumption of a legally valid civil marriage is entirely negated. *Vest*, 28 S.W.2d at 783. Pursuant to our interpretation of KRS 402.080, where parties fail to obtain the requisite marriage license prior to the solemnization of their intent to be joined in marriage, there is nothing of a civil nature for an otherwise authorized officiant to solemnize,[10] no legally valid civil marriage can arise, and there is no civil marriage to be otherwise prohibited, voided, or declared invalid. *See* KRS 402.010–030 and 403.120.

Based on the foregoing, we conclude no legally valid civil marriage ever existed between Pinkhasov and Petocz.[11] We therefore reverse and remand the trial court's rulings to the contrary.

## III. NO LEGALLY VALID *"DE FACTO* MARRIAGE"

**10.** Though, generally, Rabbi Litvin was authorized under KRS 402.050 to solemnize civil marriages in Kentucky, we read the specific prohibition found in KRS 402.080 regarding the solemnization of any marriage "without a license therefor" to mean that no minister, priest, rabbi, justice, judge, or religious society is authorized to solemnize a civil marriage absent the parties thereto first obtaining a marriage license.

**11.** Having so concluded, we shall not address in depth the trial court's ruling, as restated in its December 1, 2008, order denying Pinkhasov's motion for reconsideration, that "[i]n this case, while Rabbi Litvin may not have had authority to solemnize this marriage because a marriage certificate was not obtained under KRS 402.080, the marriage was valid because the Jewish wedding ceremony was performed while Ms. Petocz believed that Rabbi Litvin had such authority." Suffice it to say, this finding is clearly erroneous given that the overwhelming evidence demonstrates Petocz could not reasonably have believed Rabbi Litvin had solemnized a legally valid civil marriage ceremony on July 10, 2005, regardless of her perception of his authority to have done so, because: (1) she admittedly had contacted the county clerk regarding a marriage license but had failed to obtain one; (2) Rabbi Litvin had counseled her of the need to obtain a marriage license and to include solemnization of the civil marriage contract in the Jewish marriage ceremony; (3) she had rejected Rabbi Litvin's counsel and had insisted he proceed with the Jewish marriage ceremony absent a marriage license and excluding the normal solemnization of a civil marriage contract; (4) as a wedding participant, she knew Rabbi Litvin had abided by her demands regarding his performance of a purely religious marriage ceremony, and she knew he had followed her instructions that he prepare and file no documentation of a marriage-religious or civil-with the county clerk; and (5) she had indicated to Rabbi Litvin that her desire not to be legally married to Pinkhasov was due to immigration and/or citizenship concerns. Based on the foregoing, it is entirely unreasonable that Petocz could have believed herself to have been legally married on July 10, 2005, though she may have considered herself married to Pinkhosav in accordance with the laws, customs, and traditions of their Jewish faith.

 Following Rabbi Litvin's solemnization of the purely religious marriage ceremony, the trial court found Pinkhasov and Petocz had lived together as husband and wife, and had given birth to a son. Though evidence was contradictory, the trial court further found Pinkhasov and Petocz had "held themselves out to the Jewish community and members of their congregation as husband and wife." Although the parties did not adhere to all statutory solemnities, the trial court proceeded to hold as a matter of law that the parties' relationship represented a valid "*de facto* marriage."

 The term "*de facto* marriage" has been used interchangeably with common-law marriage. *See Combs v. Combs,* 787 S.W.2d 260, 261 (Ky.1990). We note that "*de facto*" means "having effect even though not formally or legally recognized." [12] In contrast to a legally valid civil marriage, a common-law marriage "takes legal effect, without license or ceremony, when two people capable of marrying live together as husband and wife, intend to be married, and hold themselves out to others as a married couple." [13] A common-law marriage has been said to exist "when the parties agree to be married to each other and hold themselves out as husband and wife to the rest of the community." [14] In *Edgewater Coal Co. v. Yates,* 261 Ky. 335, 87 S.W.2d 596, 597 (1935), our former Court of Appeals clarified:

> [s]exual relations between a man and a woman are not alone sufficient to constitute a common-law marriage. There must be an agreement to assume the marriage status. Where cohabitation and repute are relied on to show a marriage, the cohabitation must be as husband and wife, and not merely meretricious. It has been well said that "the only difference between a formal marriage under license, and a common-law marriage, is in the method of expressing consent."

(Citation omitted). Based on the foregoing, we hold that the term "*de facto* marriage" is synonymous with common-law marriage.

 It is well settled in Kentucky that there must be a marriage in fact, and common-law marriages are not recognized as valid. *McDaniel v. McDaniel,* 212 Ky. 833, 280 S.W. 145, 146 (1926). As such, common-law marriages cannot arise in Kentucky, and thus cannot supplant an invalid civil or ceremonial marriage. *Cook v. Cook,* 243 S.W.2d 900, 901 (Ky.1951). In *Pendleton v. Pendleton,* 531 S.W.2d 507, 509–510 (Ky.1976), our Supreme Court stated:

> [b]ut in this state there is no such thing as a common-law marriage. What might be a common-law marriage somewhere else is no marriage at all here. As distinguished from being "void" or "illegal" it simply does not exist as a "marriage" of any kind.

Kentucky courts will enforce rights and obligations relative to a common-law marriage where that relationship was "entered upon in a State where it is valid." *Brown's Adm'r v. Brown,* 308 Ky. 796, 803, 215 S.W.2d 971, 975 (1948). *See also* KRS 402.040. But regardless of how closely a relationship may resemble a legally valid civil marriage, Kentucky courts will not otherwise recognize such rights and obligations, and thereby reinstitute "by judi-

---

**12.** *Black's Law Dictionary* 479 (9th ed.2009).

**13.** *Black's Law Dictionary* 1060 (9th ed.2009).

**14.** 15 Louise E. Graham & James E. Keller, *Kentucky Practice–Domestic Relations Law* § 3:24 (2009) (citing Clark, Law of Domestic Relations in the United States (2d ed.) § 2.4)).

cial fiat common law marriage which by expressed public policy is not recognized." *Murphy v. Bowen,* 756 S.W.2d 149, 150 (Ky.App.1988) (citing KRS 402.020(3)).

As with the record in *Murphy,* ours "is not a case in which an innocent party is led to believe she has entered into a lawful marriage when in fact she has not," or in which Petocz was the "weaker of the two cohabitants" and fell prey to a "devious and unscrupulous" cohabitant. *Id.* Petocz's failure to obtain a marriage license or have the civil marriage contract solemnized by Rabbi Litvin during the parties' Jewish marriage ceremony was with full knowledge of what was required for establishing a legally valid civil marriage in Kentucky. By word and deed, Petocz evidenced a knowing and intentional effort to evade the creation of a legally valid civil marriage under Kentucky law and the attendant legal consequences relating to her immigration and/or citizenship status. Now, only after her purported *de facto* relationship with Pinkhasov has soured, she attempts to invoke the legal privileges and benefits of the legally valid civil marriage they both so vigorously avoided.

 Having held that a "*de facto* marriage" is synonymous with a common-law marriage, and having noted Kentucky's long-established refusal to grant legal recognition to common-law marriages formed within our borders, we therefore hold that no legally valid civil marriage was ever established between Pinkhasov and Petocz simply because of their religious expressions, public representations, and living arrangements. Kentucky's refusal to recognize common-law marriage may not be circumvented by simply appending to that relationship the alternative legal appellation of "*de facto* marriage." We therefore reverse and remand the trial court's rulings to the contrary.

### CONCLUSION

For the reasons stated above, the opinions of the Jefferson Circuit Court are reversed and remanded for entry of an order and further proceedings consistent with this Opinion.

ALL CONCUR.